IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | CR. NO. 1:06cr197-MEF-CSC |
| ) | |
| RODERICK CHARLES MELVIN ) | |

**UNITED STATES' RESPONSE TO MOTION TO SUPPRESS**

Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle of Alabama, and in response to Defendant Roderick Charles Melvin's Motion to Suppress, previously filed in this cause, state as follows:

**I.    Background**

On July 24, 2005, at approximately 5:00 p.m. Deputies Tim Crooks and Ed Preston Fleshman of the Dale County Sheriff's Office responded to a suspicious person call at the Grimes Petro Station on County Road 112, Dale County, Alabama. Activities during the early morning hours led residents to telephone the Sheriff's Department.

On Sunday morning, July 24, 2005, Mary Steele was returning to her home from purchasing a newspaper at the Grimes Petro Station when she observed a black male (later identified as Roderick Charles Melvin) with a dark colored back pack walking on the side of the road. After Ms. Steele arrived at her residence, she received a telephone call from her sister-in-law, Rebecca Hutto, who lives a couple of houses away from Ms. Steele. Mrs. Hutto asked Ms. Steele whether she had seen a black male with a back pack, because this person had just been "banging" on her door demanding to use her telephone. According to Mrs. Hutto, the subject was wearing a red muscle top [tee-shirt]. Melvin went to Mrs. Hutto back and front doors two times. Mrs. Hutto ignored Melvin hoping that he would go away. According to Mrs. Hutto's

statement, her home had been previously burglarized.[1] Therefore, Mrs. Hutto told Melvin she did not have a phone. Ms. Steele told Mr. John Herring what happened at Mrs. Hutto's residence and gave him a description of the subject.

Later on this Sunday morning, Mr. John Herring observed a subject who matched the description given by Ms. Steele come to the Grimes Petro Station. Mr. Herring said that the subject came to the Grimes Petro Station, put his back pack down outside of the store and entered the store. A short time later, the subject left the store without purchasing anything, picked up his back pack and left. According to Mr. Herring, the subject did not ask to use the phone. Mr. Herring observed the individual go behind a residence and then cross the highway and go behind a church. The individual then proceeded down the road toward Mr. Herring's residence.

Ms. Steele arrived at the Grimes Petro Station. Mr. Herring told Ms. Steele that the subject she had called about earlier had been to the store. They decided to call the Sheriff's deputies. The information related to the deputies was that there was a person going around and behind houses knocking on doors. The residents were concerned because of a previous burglar in the area.

According to Deputy Fleshman, they received what is called a "10-38", which is a call regarding suspicious circumstances. When the deputies arrived, they were met by Mr. Herring and Ms. Steele, who pointed out a vehicle that the "suspicious person" had just gotten into. Mr. Herring and Ms. Steele stated that the person appeared to be lying down in the rear seat as to

---

[1] The undersigned learned that Mrs. Hutto's home was burglarized on 03/05/05, during preparation for this response and the evidentiary hearing.

avoid being seen.[2] The vehicle was still in view when the deputies arrived. Deputy Crook will testify that he noticed the subject sitting in the back seat of the vehicle, which appeared odd to him.

The deputies executed a stop of the vehicle. Deputy Crook requested identification from the driver, James Robert Duncan and the passenger, Defendant Melvin. While Deputy Crook returned to his unit to run a check of both identifications, Deputy Fleshman stayed in a position to observe both subjects. Deputy Fleshman observed Melvin unzip his back pack and remove an object from it. As Melvin dropped the object onto the floor behind the driver's seat, Fleshman saw that it was a silver handgun. Deputy Fleshman notified Deputy Crook, who requested that both subjects get out of the vehicle for their safety and the officers' safety. Deputy Crook asked Mr. Duncan for his consent to search the vehicle. Mr. Duncan consented to the search of his vehicle. Deputies found a loaded .22 caliber revolver. Melvin was arrested for carrying a concealed weapon without a permit. Melvin was searched incident to his arrest. Deputies found 75 live rounds of .22 caliber ammunition in Melvin's front cargo pocket. Mr. Duncan said that he did not have a firearm in his car. The deputies determined that Melvin was a convicted felon.

## II.     Legal Discussion

### A.     Dale County Deputies' Stop Was Based Upon Reasonable Articulable Suspicion.

The defendant's first and most crucial argument is that Deputies Crook and Fleshman did not have probable cause to stop the car driven by James Duncan because there was no violation

---

[2] It should be noted that the defendant was given a ride by James Robert Duncan. Mr. Duncan's front passenger seat had been removed. The defendant was in the back seat of the car.

of traffic laws, the occupants had not committed any criminal offense and the vehicle did not contain contraband. The defendant's argument is meritless and the defendant misunderstands the nature of the reasonable suspicion inquiry. In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968), the officers observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. (quoting from *Illinois v. Wardlow*, 528 U.S. 119, 125-26, 120 S.Ct. 673, (2000). The Supreme held that the conduct of the two individuals was not illegal, but "suggested that the individuals were casing the store for a planned robbery." *Id.* However, *Terry* recognized that the officers could detain the individuals to resolve the ambiguity. Each case must be decided on its own face. Moreover, officers are not required to have reasonable suspicion of ongoing illegal activity in order to make investigative stops. It is enough that the officer has reasonable suspicion that criminal activity may be afoot. The very point of *Terry* was to permit officers to take preventive action and conduct investigative stops before crimes are committed, based on what they view as suspicious, although legal, activity. See, *Illinois v. Wardlow*, 528 U.S. 119, 125-26, 120 S.Ct. 673, (2000). The *Terry* standard is whether an officer reasonably believed that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968), not whether there is probable cause to believe that a crime has been committed.

      In the instant case, the officers had sufficient reasonable suspicion based upon their collective experiences, the call to the Sheriff's Office describing the defendant's activities, and the defendant's appearance of hiding in the back seat of Duncan's vehicle as he passed the

Grimes Petro Station.[3]  As discussed in *Wardlow*, the Supreme Court reasoned that

> "*Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe that they have committed a crime may turn out to be innocent. The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way. But in this case the officers found respondent in possession of a handgun, and arrested him for violation of an Illinois firearms statue.

*Wardlow* at 126.

The facts are very similar in this case.  Concerned reliable citizens reported what they believe to be suspicious activities in their neighborhood. These activities were not witnessed by only one person who immediately panicked, but by three different individuals.  Collectively, they witnessed the defendant do the following: (1)  go to the rear and front of several houses and a church; (2)  pass an operative pay phone while requesting to use a resident's phone; (3) go into a store (Grimes Petro Station) and leave without asking to use a phone; and (4) appear to lean down in a vehicle as to avoid being seen when the police arrived.  Based upon a totality of the circumstances in this case, the deputies had an obligation to investigate further, especially since there had been a burglary in the small community a few months earlier.  In *Illinois v. Gates*, 462 U.S. 213, 230-235 (1983), the Supreme Court held that the Fourth Amendment touchstone of "reasonableness" rejects a rigid absolute rule and encourages the practical and particularized review of stops and searches.  Applying the same principle in this case, neighborhood watch

---

[3]  Deputy Crook will testify that when he began his shift, he learned that deputies had been to the area earlier in the day looking for the same subject.  Crook was given a clothing description of the subject and that the subject had been knocking on doors and attempting to get into houses.  The subject in Mr. Duncan's vehicle matched the description Crook had been given.

would have absolutely no affect on safeguarding and protecting themselves from criminal activity that may be afoot. Instead, neighbors would be required to watch and wait until an actual crime has been committed and then call law enforcement after the fact. The more practical approach, as in *Gates* and *Terry*, would be to do just as Mrs. Hutto, Ms. Steele and Mr. Herring did in this case.

      **B.**    **The Defendant Lacks Standing to Challenge the Search of the Vehicle.**

Defendant Melvin does not have standing to challenge the search of Duncan's vehicle. Fourth Amendment rights are personal rights which cannot be asserted by a mere passenger in a vehicle. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas* at 134. The defendant in the instant case has not demonstrated that he had an expectation of privacy in Duncan's vehicle, the place searched, and that the expectation of privacy is reasonable. *United States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999). Notwithstanding, Mr. Duncan gave Deputy Crook consent to search his vehicle.

**II.**    **Conclusion**

For the reasons stated above, the stop of the vehicle was justified and Defendant Melvin had no expectation of privacy in the vehicle searched. Therefore, his motion to suppress should be denied.

Respectfully submitted on this 23rd day of October 2006.

        LEURA G. CANARY
        UNITED STATES ATTORNEY

        /s/Tommie Brown Hardwick
        TOMMIE BROWN HARDWICK
        One Court Square, Suite 201
        Montgomery, AL 36104
        Phone:  (334) 223-7280
        Fax:  (334) 223-7135
        E-mail:  tommie.hardwick@usdoj.gov
        ASB4152 W86T

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | CR. NO. 1:06cr197-MEF-CSC |
| | ) | |
| **RODERICK CHARLES MELVIN** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Kevin L. Butler, Esq.

Respectfully submitted,

/s/Tommie Brown Hardwick
TOMMIE BROWN HARDWICK
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: tommie.hardwick@usdoj.gov
ASB4152 W86T