IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR. NO. 1:06cr197-MEF |
| | ) | (WO) |
| RODERICK CHARLES MELVIN | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

The defendant, Roderick Charles Melvin ("Melvin"), is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On October 11, 2006, Melvin filed a motion to suppress evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. *See* Doc. # 13. The defendant alleges the officer who stopped the vehicle in which he was riding lacked reasonable suspicion for the stop. On October 25, 2006, the court held an evidentiary hearing and heard argument on the motion. Based on the motion, the evidence presented during the suppression hearing, the argument of counsel and the briefs of the parties, the court concludes that the motion to suppress is due to be granted.

**FACTS**

Before 9:00 a.m. on Sunday morning, July 24, 2005, in the Grimes area of Dale County, Alabama, Rebecca Hutto heard someone knocking on her front door. (Evid. Hr'g Tr. at 40). Hutto did not answer the knock. (*Id.*) The person knocked on the front door and the back door at least three times before Hutto asked what the person wanted. (*Id.* at 43). The individual, a man, asked to use her phone. (*Id.*). Hutto informed him that she did not

have a phone. (*Id.* ).  The person then left. (*Id.*).  Hutto did not see the individual – she only saw his backpack and shirt. (*Id*. at 42).  He was wearing a red, sleeveless muscle shirt. (*Id*. at 47).

While the individual was at her back door, Hutto called her sister-in-law, Mary Steele. (*Id* at 43).  Hutto told Steele that "there's someone trying to get in my house, they are beating on the back door." (*Id*. at 44).  Hutto did not describe to Steele the individual or his clothing. (*Id*. at 44).  Hutto did not call the police. (*Id*. at 49-50).

Steele later telephoned Hutto to say that she saw the person when she left her house to go to the Petro gas station in Grimes. (*Id*. at 48).  The record is not at all clear as to what time Steele left her house, when she saw the individual, where she saw the individual or when she called Hutto.[1]

Some time during the "later part of that Sunday morning," Steele encountered John Herring at the Petro gas station. (*Id*. at 57).  Steele told Herring that "someone had tried to break into her sister-in-law's house that day.  And that she had saw this guy that she had described walking up the road." (*Id*. at 52).

Much later that afternoon, between 4:00 and 5:00 p.m., Steele was again at the Petro station.  She told Herring that she had seen the individual go behind the station. (*Id*. at 58).  Although Steele described the individual to Herring, the evidence before the court does not include that description.  Herring left the station in search of the individual. (*Id*.).  Steele also

---

[1] Steele did not testify at the evidentiary hearing.  The evidence suggests but does not support a finding that Steele saw the individual near her house which is close to Hutto's home. (Evid. Hr'g Tr. at 48).

2

called the police from the Petro station[2] and called Hutto, late in the afternoon, to tell her that "he showed up at Petro." (*Id*. at 44).

Herring saw someone walk across the street, behind a house and go behind a church. (*Id*. at 53). He was wearing a black and red jersey shirt and pants, similar to a jogging suit. (*Id*. at 58-59). He was also carrying a large duffle bag. (*Id*. at 53). The person then left the church and came to the Petro station. (*Id*.). The individual bought a sandwich and left. (*Id*. at 54). Because the person was walking towards his house, Herring left the Petro station and went home. (*Id*.) On the way, Herring saw the person get into a car. When the individual got into the car, Herring went back to the station. (*Id*.) As Herring pulled into the parking lot at the Petro, Dale County Deputy Sheriff Timothy Crooks pulled into the parking lot. (*Id*.)

Crooks was responding to a dispatch call of a suspicious person in the Grimes, Alabama area. The person was described as a black male.[3] (*Id*. at 8). When Crooks arrived at the Petro, John Herring approached Crooks' patrol car, pointed to a teal-colored car and said "the guy you've been looking for just got in that car." (*Id*. at 10). The evidence does not show how Herring knew this because he had not seen any other deputies before Crooks arrived.[4] (*Id*. at 52).

---

[2] The record does not indicate when Steele called the police or what she told them when she called.

[3] Although Crooks testified that he was also provided a clothing description, he had no recollection of what that description was.

[4] Crooks testified that "a deputy passed on to me that they had been dispatched out there a couple
(continued...)

Based only on the statement by Herring about "the guy you've been looking for," Crooks stopped the car "[a]pproximately a half mile below the [Petro] store on County Road 112." (*Id*. at 12). As he and deputy Fleshman approached the car, Fleshman saw Melvin take a pistol from his duffle bag and drop it on the floor. (*Id*. at 15).

Melvin was subsequently indicted for being in a felon in possession of firearm. *See* 18 U.S.C. § 922(g).

## DISCUSSION

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV.[5] The amendment's primary purpose is to protect citizens from unwarranted governmental intrusion and to prevent abusive police power. *See Johnson v. United States*, 333 U.S. 10, 13 (1948); *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (plurality opinion).

The only issue in this case is whether Crooks' initial stop of the vehicle in which

---

[4](...continued)
of times that day on a 10-38 [suspicion person] call." (Evid. Hr'g Tr. at 8).

[5] The entire text of the Amendment provides:

[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Melvin was riding, an encounter commonly referred to as a *Terry*[6] stop, was supported by reasonable suspicion.[7] Absent probable cause to make an arrest, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  *See also Adams v. Williams*, 407 U.S. 143 (1972).  The reasonable suspicion required for a *Terry* stop is more than a hunch, and considering the totality of the circumstances, must be supported by some minimal level of objective justification that criminal activity "may be afoot."  *Wardlow*, *supra*.  *See also United States v. Sokolow*, 490 U.S. 1, 7-8 (1989).

> To make a showing that he in fact had reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" [*Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000)] (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1868). Thus, "'[w]hile "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir.2000) (quoting *Wardlow*, 120 S.Ct. at 675-76).  A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.  *See Wardlow*, 120 S.Ct. at 677; *Terry*, 392 U.S. at 22-23, 88 S.Ct. at 1868.

*United States v. Gordon,* 231 F.3d 750, 754 (11th Cir. 2000).  *See also United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995).

The court concludes that, in this case, the United States has failed to establish that

---

[6] *See Terry v. Ohio*, 392 U.S. 1 (1968).

[7] The fact that Melvin happened to be in a car is immaterial for the purpose of this motion.

officer Crooks had reasonable, articulable suspicion sufficient to justify stopping Melvin. "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors – quantity and quality – are considered in the "totality of the circumstances – the whole picture." *Alabama v. White*, 496 U.S. 325, 330 (1990). *See also United States v. Heard*, 367 F.3d 1275, 1278 (11th Cir. 2004). The undisputed evidence at the hearing demonstrated that Crooks stopped Melvin simply because Herring said "the guy you are looking for is in that car." (Evid. Hr'g Tr. at 10).

> Q:   What did you do when they pointed to that car and said the person that you are looking for was in that car?
>
> A:   I pulled out behind it, ma'am, and started following it.

(Evid. Hr'g Tr. at 12).

Without more, Herring's statement is simply insufficient to support the stop. The United States did not present any evidence that at the time Crooks stopped the car, he relied on any other information which he had or that he made any attempt to connect that information to the Herring's statement about the "guy" in the teal-colored car.[8] Consequently, the court concludes that these facts are insufficient as a matter of law to give

---

[8] It is not at all clear that Melvin was the same person who stopped that morning at Mrs. Hutto's house. Herring testified that he had not obtained any information from Hutto (Evid. Hr'g Tr. at 56), that Steele did not see the person at Hutto's house (*Id.*); and that Steele told him only that she believed the person met Hutto's description (*Id.*). Herring testified that he did what he did as a concerned citizen and "not as a law enforcement officer. But I did – you know, any stranger, you notice a stranger . . ." because Grime is a small community. (Evid. Hr'g Tr. at 57).

rise to a reasonable suspicion that criminal activity was afoot and the defendant was involved.

Moreover, "the presence of an individual matching the physical description given by an anonymous tip in the area indicated by the tip is insufficient, standing alone, to establish reasonable suspicion." *United States v. Davis*, 175 Fed. Appx. 286, 288 (11th Cir. 2006). *See also United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000) (fact that defendant was "sighted standing alone, at night, within ten feet of a parked car, surrounded by largely abandoned buildings, in an area notorious for violent crime and drug trafficking" was insufficient to justify *Terry* stop). Of course, here, the tip by Herring was not anonymous, but under the circumstances, the tip lacked any reliability in the same way as an anonymous tip because Crooks did nothing to determine the basis for Herring's statement about Melvin.

Furthermore, Melvin did not match the description provided by Hutto. He was not wearing a red, sleeveless muscle shirt nor was he carrying a black backpack; he was wearing a red shirt with white stripes on the sleeves and carrying a duffle bag. Even if Melvin had matched Hutto's description, her description alone is not sufficient to establish reasonable suspicion. "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires a tip be reasonable in its assertion of illegality, not just in its tendency to identify a

determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000).

The court looks to Crooks' knowledge prior to initiating the stop to determine whether the stop was based on reasonable, articulable suspicion. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Although Crooks testified that a deputy told him that someone was "[b]asically just walking around people's houses, knocking on doors, trying door knobs," there is no evidence before the court to demonstrate the reliability of the deputy's information. *See Florida v. J.L.*, 529 U.S. 266, 274 (2000). "Reasonable suspicion need not be based on an officer's personal observations, but rather may be based on information supplied by another person, so long as the information bears sufficient indicia of reliability." *United States v. Fields*, 178 Fed. Appx. 890, 892 (11th Cir. 2006). While it is permissible for Crooks to rely on information provided to him by another deputy, some evidence must be presented as to what information the deputy had, when the deputy received it and from whom. The only evidence before the court demonstrates that at some point on July 24, 2005, Steele called the police. There is no evidence before the court about whether she identified herself; what information she gave the police, including whether she gave a description of the 'suspicious person' and what that description was; or what time she called. This is not a case in which a "victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime - the subtleties of the hearsay rule should not thwart an appropriate police response."

8

*Adams*, 407 U.S. at 147.  Consequently, the court has no way of judging the veracity of Steele or the information she provided.

Crooks testified that deputies had been dispatched out to the Grimes area several times, but he did not recall who told him that nor could he remember what he was told. Herring testified that he had not seen any other deputies that day.  The undisputed evidence demonstrates that Crooks was responding to a suspicious person call when he came on duty. He did not conduct any independent investigation or take any steps to corroborate any information he received when he came on duty.  He stopped Melvin based solely on Herring's assertion that "the guy he was looking for" was in the car.  Based on the totality of the circumstances, the court concludes that Crooks' investigatory stop of Melvin was not supported by articulable, reasonable suspicion and, therefore, was in violation of the Fourth Amendment.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be granted and the evidence seized as a result of the stop be suppressed.  It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **November 21, 2006.**[9]  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that

---

[9] The court shortens the time for filing objections to afford the court sufficient time to consider the objections to the recommendation before the trial on November 27, 2006.

9

this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 14th day of November, 2006.

/s/Charles S. Coody
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE