IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cr-197-MEF |
| | ) | (WO) |
| RODERICK CHARLES MELVIN | ) | |

## **MEMORANDUM OPINION AND O R D E R**

### I. INTRODUCTION

This cause is before the Court on the Motion to Suppress Evidence (Doc. # 13) filed by Defendant Roderick Charles Melvin ("Melvin"). The Court has carefully reviewed the Motion to Suppress, the evidentiary record submitted in support of and in opposition to the Motion to Suppress, the Recommendation of the Magistrate Judge (Doc. # 18), the United States' Objections to the Recommendation of the Magistrate Judge (Doc. # 32), and the Defendant's Reply to Objection by the United States (Doc. # 36). It is the judgment of the Court that the Motion to Suppress (Doc. # 13) is due to be GRANTED, the Recommendation of the Magistrate Judge (Doc. # 18) is due to be ADOPTED, and the United States' Objections (Doc. # 32) are due to be OVERRULED.

### II. FACTS

The Magistrate Judge provided an excellent and comprehensive factual narrative in his Recommendation. *See generally* Doc. # 18. Melvin made no objections to the Recommendation. The focus of the government's Objections to the Recommendation is "that the facts as stated in the Recommendation of the Magistrate Judge do not paint the 'whole


picture' ... [in that] the court's findings of fact do[] not address the [arresting officer's] knowledge which is contained in the early portion of his testimony." Doc. 32 at 2. The Court ACCEPTS the recitation of the facts set forth in the Recommendation of the Magistrate Judge and OVERRULES the government's objections to the factual finding because, for the reasons stated in the discussion section of this Memorandum Opinion and Order, the additional facts asserted by the government do not establish reasonable suspicion for this particular *Terry* stop. For the sake of clarity, the facts most salient to this Court's analysis are set forth below.

The events leading to Melvin's arrest in the late afternoon on July 24, 2005 in the Grimes area of Dale County, Alabama, began earlier that day when Rebecca Hutto ("Hutto") heard a knock at her front door. As described in the Magistrate Judge's Recommendation:

> Hutto did not answer the knock. The person knocked on the front door and the back door at least three times before Hutto asked what the person wanted. The individual, a man, asked to use her phone. Hutto informed him that she did not have a phone. The person then left. Hutto did not see the individual -- she only saw his backpack and shirt. He was wearing a red, sleeveless muscle shirt.
>
> While the individual was at her back door, Hutto called her sister-in-law, Mary Steele. Hutto told Steele that "there's someone trying to get in my house, they are beating on the back door." Hutto did not describe to Steele the individual or his clothing. Hutto did not call the police.
>
> Steele later telephoned Hutto to say that she saw the person when she left her house to go to the Petro gas station in Grimes.

Doc. 18 at 1-2 (internal citations to the record omitted). Later that morning, Steele ran into

an acquaintance, John Herring ("Herring"), at the gas station, which, according to Herring, was "kind of like the central meeting place for a lot of people in the town."  Doc. 28 at 57. As Herring testified at the suppression hearing, Steele relayed to Herring that "someone had tried to break into her sister-in-law's house that day" and that Steele had spotted the suspect walking up the road.  *Id.* at 52.

In the late afternoon, between 4:00 and 5:00 p.m., Steele was again at the gas station.  This time, Steele told Herring that she had seen the person in question go behind the station. Steele described the person, but, as noted by the Magistrate Judge, "the evidence before the court does not include that description."  Doc. 18 at 2.[1]  Steele also called the police from the gas station but no record exists as to what she told them.  Herring ventured out of the station to find this person.  Herring testified as follows:

> [Steele] described where -- told me where he went, so I said well I will go and see if I can see him anywhere.  She had told me he had gone right behind the store.  So I went to -- sort of behind the store and I saw him.  He walked across the street, went behind another house, came out behind it, crossed the road and walked down the road and went in behind a little church.  They have a room there they cook barbeque and all in, and he went in it.  And I stood there and watched him.  I don't know how long he stayed there, you know, probably maybe five, ten minutes, really I don't know.

Doc. 28 at 52-53.  According to Herring, the person was wearing a black and red jersey shirt and had with him a large duffle bag.  After emerging from the church, the individual went

---

[1] Herring testified: "Mae Steele had told me in the store, she described this fellow, and that she had seen him go behind the store."  Doc. 28 at 58.

towards the gas station, left his duffle bag outside, went into the station store, bought a sandwich, and then left.  After leaving the store, the man "picked his duffle bag up and started up the road walking." *Id.* at 54.

Herring, who thought that the individual was heading in the direction of his house, left to go home.  On his way home, and upon seeing the person get into a car, Herring went back to the gas station.  There, Herring encountered Dale County Deputy Sheriff Timothy Crooks ("Crooks") as the officer pulled into the gas station lot.  Crooks was responding to a suspicious persons dispatch for what was described as a black male.[2]  Herring came up to Crooks's patrol car, pointed at a "teal colored older model car," and said to the officer, "the guy you've been looking for just got in that car." *Id.* at 10.

Operating only on the basis of the statement made by Herring that "the guy you've been looking for just got in that car,"[3] Crooks stopped the car flagged by Herring "[a]pproximately a half mile below the store on County Road 112." *Id.* at 12.  Crooks approached the driver's side of the car as his fellow deputy, Preston Fleshman ("Fleshman"),

---

[2] Crooks testified that he was also given a clothing description, but could not recall the details of the clothing description.

[3] Crooks did not see the car commit any traffic offenses nor did Herring communicate to Crooks that Herring had seen any criminal offense or criminal activity.  The government argues that this does not paint the "whole picture" because when Crooks started his shift that afternoon a fellow officer had relayed that the police responded that day to a 10-38 suspicious persons call.  Further, the government contends, "Crooks already had personal knowledge that there were several burglaries in the Grimes community in the past several months, including a burglary he personally responded to at the home of Rebecca Hutto."  Doc. 32 at 5.

stood behind the car on the right-hand side. As Crooks checked the driver's information, deputy Fleshman noticed Melvin, who was in the back seat, "remove a handgun from his duffle bag and drop it on the floorboard." *Id.* at 15. Melvin was later indicated for being a felon in possession of a firearm.

## III. DISCUSSION

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). A seizure takes place "[w]henever a police officer accosts an individual and restrains his freedom to walk away and the Fourth Amendment requires that the seizure be reasonable." *Id.* (internal citations and quotations omitted). Traffic stops qualify as seizures under the Fourth Amendment. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment.]"); *Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

Because traffic stops are considered more similar to investigative detentions than formal arrests, courts analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio,* 392 U.S. 1 (1968). *See, e.g., Berkemer v.*

*McCarty,* 468 U.S. 420, 439 (1984); *United States v. Boyce,* 351 F.3d 1102, 1106 (11th Cir. 2003); *Perkins,* 348 F.3d at 969; *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir. 2001), *cert. denied,* 534 U.S. 830 (2001). Under the *Terry* framework, even where there is not sufficient probable cause to make an arrest, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).

This standard of reasonable suspicion, though less demanding than that of probable cause, still "requires at least a minimal level of objective justification for making the stop." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion requires that the officer "articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* (citations and internal quotations omitted). While there is no requirement that the officer must actually witness illegal activity,[4] whether the minimal level of objective justification for making the stop amounts to reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). These factors, the quantity and quality of the information, are considered in the "'totality of the circumstances -- the whole picture.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

---

[4] Indeed, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000).

Reasonable suspicion, though ultimately judged from an objective standard, is formed from the subjective perspective of the officer. While it is tempting to supplement the officer's subjective perception with facts and circumstances to which the officer was not privy, reasonable suspicion is gleaned solely through the narrow focus of the officer's field of vision. So, the question becomes: what information did Crooks have at his disposal to form reasonable suspicion in stopping the car?

Essentially, other than being told before going on duty that his fellow officers had already attended to the Grimes area on a suspicious persons call,[5] the extent of Deputy Crooks's suspicion consisted of Herring's statement that "the guy you've been looking for just got in that car." Doc. 28 at 10. Based solely on that statement by Herring, Crooks stopped

---

[5] Crooks could not remember either who had told him this information or exactly what he was told about the suspicious person. On four separate occasions during his testimony at the suppression hearing, Crooks testified that he could not remember a specific description that was given to him by his fellow deputy. Doc. 28 at 8, 25, 30, 32. ("There was a description given, a black male, and there was a clothing description, but ... I don't remember what it was"; "I don't remember any specific conversation I might have had with that deputy"; "I don't recall exactly what was dispatched as far as the clothing description"; "I don't remember what specifically was dispatched to us"). Later, on the stand, Crooks clarified that "[his] position is that the best [he] can recall is that [the description given to him over the dispatch] was a black male in a red shirt and cargo pants." *Id.* at 33. Although reasonable suspicion may be based on information supplied by a third party, such as, in this case, a fellow police officer, the information must still bear "sufficient indicia of reliability." *United States v. Fields*, 178 Fed. Appx. 890, 892 (11th Cir. 2006). As noted by the Magistrate Judge, "[t]here is no evidence before the court about whether [Steele] identified herself [when she called the police]; what information she gave the police, including whether she gave a description of the 'suspicious person' and what that description was; or what time she called." Doc. 18 at 8. Therefore, it is impossible to say whether the information supplied to Crooks bore any indicia of reliability.

7

the car and subsequently arrested Melvin.

The government contends that this characterization leaves too much meat off the bone. For example, the government places significance on the fact that "Herring was present when Ms. Steele called the police, so that he expected the police to arrive" and also personally observed the suspicious person enter the vehicle he flagged for Deputy Crooks. *Id.* at 4. These facts are certainly significant, but only so if Crooks had been made aware of them. Existing by themselves -- without being communicated to the responding officer -- Herring's first-hand knowledge is irrelevant to the reasonable suspicion inquiry. Therefore, as discussed by the Magistrate Judge in his Recommendation, "the tip by Herring was not anonymous, but under the circumstances, the tip lacked any reliability in the same way as an anonymous tip because Crooks did nothing to determine the basis for Herring's statement about Melvin." Doc. 18 at 7.

The government also tries to highlight the fact that "Crooks already had personal knowledge that there were several burglaries in the Grimes community in the past several months, including a burglary he personally responded to at the home or [sic] Rebecca Hutto." Doc. 32 at 5. While this provides further context, it does not lead to a forming of reasonable suspicion. There is nothing in this prior knowledge of burglaries that was related in any way to either the teal-colored car that Crooks subsequently pulled over or the passenger in the car that was the subject of the stop. Further, Crooks was not aware that this particular suspicious persons call was in any way related to Rebecca Hutto. The only information Crooks had

about this particular suspicious persons call was that which was relayed to him by dispatch.

While this Court finds that there was no reasonable suspicion for the *Terry* stop, this is not to say that the police acted in a wholly inappropriate manner. The stop of the car and the temporary detention of the passengers did not pass constitutional scrutiny, but Crooks does not necessarily deserve rebuke. There are certain realities that police officers face in smaller communities that law enforcement in larger communities do not. As noted by the government in its objection to the Recommendation, "Grimes is a small community and a stranger is noticed." Doc. 32 at 4. While the Fourth Amendment is applicable to a temporary stop of an individual or vehicle no matter the size of the community in which the stop occurs, it is nonetheless understandable why Crooks responded in the way he did to Herring's tip, even in spite of the fact that the tip lacked any indicia of reliability. Given that Crooks was responding to a suspicious persons call in a small and inclusive community, it is not inconceivable to think that Herring, a member of that community, was pointing out the subject of that call. As peculiar as this may be to people in Atlanta, Miami, or even Montgomery, a community like Grimes is one where everyone knows everyone else. This may not comport with the Fourth Amendment, but it does explain the context in which the stop occurred, and, for these reasons, this Court hopes that the citizens of Grimes continue to enjoy the protection of a police force which apparently takes its responsibility very seriously.

## IV.  CONCLUSION

Based on the foregoing, and after an independent review of the file, it is the ORDER, JUDGMENT and DECREE of the Court as follows:

(1) The Motion to Suppress (Doc. # 13) is GRANTED.

(2) The Recommendation of the Magistrate Judge (Doc. # 18) is ADOPTED.

(3) The Objections to the Recommendation of the Magistrate Judge (Doc. # 32) are OVERRULED.

DONE this the 6th day of February, 2007.

                                                  /s/ Mark E. Fuller
                                      CHIEF UNITED STATES DISTRICT JUDGE